IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No.: 1:22-cv-01883-SKC

GREG HARRIMAN,
ANDREW KAMBICH, and
ELIZABETH KAMBICH,

      Plaintiffs,

v.

JOHN SMART,

      Defendant.

**ORDER GRANTING DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE EXPERT TESTIMONY FROM ALYSSA NIETO (DKT. 54)**

      The above-referenced Motion is now before the Court. No hearing is necessary to aid the Court's ruling. Before addressing the Motion, the Court first admonishes counsel to tone it down. This Court's Uniform Civil Practice Standards advise counsel to "[p]lease avoid characterizing the opposing party's actions ('counsel conveniently overlooked,' 'counsel attempts to mislead the court by stating,' etc.). Such characterizations serve no purpose and merely add to the overall amount of reading materials for a particular matter." SKC Civ. Practice Standard 10.1(c)(4). And this Court's Standing Order for Civil Cases advises that "[t]he Court's mission is best served when litigants treat each other with civility. Though litigation is understood

1

to be an 'adversarial' process, it is possible for counsel and parties to disagree and zealously advocate their positions while at the same time treating each other with courtesy and respect. The Court expects nothing less." SKC Standing Order, Section A.2. The parties' briefing on the Motion runs afoul of these rules. The Court expects better of counsel. Any future filings which waste the Court's time with disparaging remarks directed at counsel or any party will be summarily stricken and sanctions will be considered.

This is a breach of contract case. Trial will be to the Court. On December 31, 2021, Plaintiffs and Defendant entered a Stock Purchase Agreement (SPA) whereby Plaintiffs purchased all the issued and outstanding shares of 411 Flash Corporation ("Company") from Defendant.[1] Colorado law governs the SPA. Dkt. 33-1 (SPA), p.32. Relevant to the Motion, Plaintiffs claim Defendant breached Section 4.09 of the SPA, alleging:

> In Section 4.09 of the Purchase Agreement, Defendant agreed, represented, and warranted that the "vehicles and other items of tangible personal property of the Company" were "structurally sound," "in good operating condition and repair," and "adequate for the uses to which they are being put." Additionally, Defendant represented that "none of" the vehicles were "in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost."

Dkt. 33, ¶24. Despite his representations, the Company spent a total of $33,000 in repairs made to 13 vehicles transferred at the closing. Plaintiffs allege Defendant

---

[1] The Company provides individuals with non-emergency medical transportation services.

breached Section 4.09 of the SPA because the repairs made to these vehicles went beyond "ordinary, routine maintenance and repairs" and they were "material in nature or cost," all within the meaning of Section 4.09.

In support of this claim, Plaintiffs engaged an expert witness, Alyssa Nieto, whom they disclosed as a "mechanics expert." Dkt. 54-1, p.1. Ms. Nieto is not an auto mechanic or auto technician. She is a 2014 high school graduate who began her career in the automotive industry in December 2016 as a receptionist at Community Auto Repair Shop. From 2017 to 2020, she mentored under the repair shop owner and the lead technicians working her way from receptionist to Service Advisor. She eventually earned her role as Service Manager where she oversaw the day-to-day operations of two locations. In March 2022, the owner opened a third location where she is currently the Manager and manages a crew of technicians and service advisors. Her location services an average of 100 - 200 vehicles per week in a range of repairs on a range of makes and models of vehicles.

Ms. Nieto formed three opinions each of which are the subject of the Motion. Those opinions are:

- The Vehicles were not in good operating condition and in need of substantial, material repair, well beyond that which could be considered ordinary or routine that should have been communicated.

- The plain language meaning of the term 'routine maintenance and repairs' refers to repairs and maintenance that are common, regular, typical, and expected; such as oil changes, filter replacements and other routine maintenance common in vehicles of any mileage.

3

- The repairs to the Vehicles were not "ordinary, routine maintenance and repairs that are not material in nature or cost."

Dkt. 54-2, p.13.

With his Motion, Defendant challenges these opinions. As to the first opinion, Defendant argues Ms. Nieto's testimony must be excluded under Fed. R. Evid. 702 "because her general experience managing an auto body repair shop does not qualify her to opine on specific issues of automobile mechanics," and he further argues her opinions would not be helpful to the factfinder. He contends that her remaining two opinions must be precluded as invalid legal conclusions.

## LEGAL PRINCIPLES

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). A witness who qualifies as an expert by knowledge, skill, experience, training, or education may offer their opinions at trial if the proponent satisfies the court that it is more likely than not: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

Trial courts determine the reliability of expert testimony by considering whether: (1) the theory has been or can be tested or falsified; (2) the theory or

4

technique has been subject to peer review and publication; (3) there are known or potential rates of error regarding specific techniques; and (4) the theory or approach has general acceptance. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). And of course, expert testimony must also be relevant to be admissible. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006); Fed. R. Evid. 401.

The district court performs an important gatekeeping function to assure expert testimony meets these requirements. *Macsenti v. Becker*, 237 F.3d 1223, 1230-34 (10th Cir. 2001). Even still, courts are mindful that "Rule 702 mandates a liberal standard" for the admissibility of expert testimony. *Cook*, 580 F. Supp. 2d at 1082. The rejection of expert testimony has proven "the exception rather than the rule." Fed. R. Evid. 702, advisory committee notes (2000 amendments). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The decision to admit or exclude expert testimony is committed to the sound discretion of the district court. *Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir. 1997).

## ANALYSIS AND FINDINGS

The Court starts with Ms. Nieto's latter-two opinions noted above. These latter opinions involve her interpretation(s) of Section 4.09 of the SPA, and therefore, they

5

are not appropriate for expert testimony and are disallowed. *See Bethel v. Berkshire Hathaway Homestate Ins. Co.*, 596 F. Supp. 3d 1260, 1267 (D. Colo. 2022) ("[C]ontract interpretation is not a proper subject for expert testimony."); *see also TCR Sports Broad. Holding, LLP v. Cable Audit Assocs., Inc.*, No. 13-CV-01803-CMA-CBS, 2016 WL 1170106, at *2 (D. Colo. Mar. 25, 2016), *aff'd*, 674 F. App'x 805 (10th Cir. 2017) ("In Colorado, contract interpretation is a question of law, not of fact."); *Liberty Mut. Fire Ins. Co. v. Michael Baker Int'l, Inc.*, No. 2:19-cv-00881-JNP; 2022 WL 973079, at *14 (D. Utah Mar. 31, 2022) ("the court will not entertain expert testimony that usurps the court's responsibility of interpreting the contract");

Her first opinion warrants more discussion. Plaintiffs argue that Ms. Nieto's training and experience qualifies her as an expert. For purposes of this analysis, the Court assumes (without deciding) that Ms. Nieto is sufficiently qualified as an expert by training or experience to offer testimony in the form of opinions. Fed. R. Civ. P. 702. The problem is less with whether Ms. Nieto qualifies as an expert by training or experience, and more with whether her first opinion is reliable. The Court concludes it is not.

If an expert is sufficiently qualified then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Nacchio*, 555 F.3d at 1241. "Reliability questions may concern the expert's data, method, or his application of the method to the data." *Id.* An expert's conclusions must be based on the "methods and procedures of science," not on

"subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Thus, the focus of reliability is "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

"If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Civ. P. 702 (advisory committee note to the 2000 amendments). Proper exercise of a court's gatekeeping function does not allow a court to simply take the expert at their word. *Id.* To be sure, Rule 702 expressly provides that expert opinion be based on "sufficient facts or data." Fed. R. Evid. 702(b). "Thus, the proponent of expert testimony must show that the witness' experience, and resultant specialized knowledge, is sufficiently related to the issues and evidence." *Vigil v. Burlington N. & Santa Fe Ry. Co.*, 521 F. Supp. 2d 1185, 1204 (D.N.M. 2007).

Ms. Nieto's opinions are solely experience-based. Dkt. 60, p.3 ("Ms. Nieto's Experience Qualifies Her to Testify as an Expert."); Dkt. 54-2, p.4 ("I have based my opinions upon my professional experience, technical training, and the information and data available to me as of the date of this Report."). And Plaintiffs argue Ms. Nieto's "methodology is reliable under the circumstances of *this* case." Dkt. 60, p.10 (emphasis in original). They argue she based her opinion "not only on her experience, but also analyzed, referenced, and employed industry-standard electronic factory maintenance databases. She arrived at her opinions as to the nature of the specific

repairs at issue in this litigation through a combination of experience, informal training, specialized knowledge, and reference to industry standard sources." *Id.*

But in its own review of her report, the Court disagrees over the reliability of any methodology Ms. Nieto might have employed. Throughout her report, Ms. Nieto fails to "explain how [her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Civ. P. 702 (advisory committee note to the 2000 amendments). And in this regard, Plaintiffs have failed to meet their burden to show that Ms. Nieto's opinion is supported by any particular methodology to render it reliable. *See, e.g., Nacchio*, 555 F.3d at 1241; *Daubert*, 509 U.S. at 595. There are several examples:

- While she indicates she used "Mitchell1 and ProDemand to reference factory maintenance due by time and mileage" (Dkt. 54-2, p.2), she never identifies or explains what the applicable factory maintenance schedules were for each specific vehicle or for the repairs that were made— hypothetically, for example, identifying that at 50,000 miles either or both sources recommend replacement of the torque converter for a vehicle of the same make and model as that associated with Invoice CHCS522309, and then explaining that the torque converter shown for that vehicle was not timely replaced and instead failed at 58,942 miles. *See id.* at p.4.

8

- Ms. Nieto opines that several vehicles needed repairs due to "part failure." She defines "Part Failure" as referring to "mechanical repairs needed due to a part structurally failing not by one thing in particular but by normal life expectancy for said part." *Id.* at p.3. But she cites no source from which she derives this definition or, in the alternative, an explanation of how it derives from her experience. She then identifies invoices with parts that failed at a certain mileage associated with that vehicle. But she does not opine that any of these parts (per some industry standard or maintenance schedule) should have been replaced before expiration of their normal life expectancy as part of routine maintenance.[2] And in these regards her opinion is wanting of any methodology.
- Referencing three invoices, Ms. Nieto opines, "[o]n average, a typical person puts around 12,000 miles/year on a personal vehicle. On commercial vehicles, however, it is common to need to service a vehicle more often due to increased use. At 350,000 - 361,000+ miles on the vehicle, it is not surprising to see power steering pump bearings, rubber heater hoses, and electric throttle bodies start to fail." *Id.* at p.8. Again, she cites no source from which she derives these opinions or, in the alternative, an explanation of how they derive from her experience. And, if in her opinion it is "not

---

[2] And query whether a part needs to be replaced prior to its normal life expectancy. Ms. Nieto's opinion does not answer this query, which further demonstrates the lack of any applied methodology.

9

surprising to see" certain parts fail in commercial vehicles with the referenced mileage, then she does not explain how something so unsurprising relates to routine vehicle maintenance and repair, or the lack of it.

- Regarding Vehicle 473, Ms. Nieto opines, "[t]o replace the oil filter housing at 178,127 miles due to a leak would be considered Part Failure." *Id.* But she offers no further explanation or methodology for how she reached the conclusion that this replacement "due to a leak" equates to "Part Failure."

- Ms. Nieto opines that "[e]xcessive use of electronic and external parts will also increase the likelihood that accessory parts of the vehicle will fail— such as doors, locks and windshield wiper arms." *Id.* at p.9. She identifies replacement of the door lock actuator in Vehicle 57 as a part failure, but then says, "[t]his is an electrical component that after so many uses and years will fail." *Id.* at p.11. Again, if it's expected to fail after a period of use or years, she does not explain what maintenance, if any, should have been done prior to the natural or expected failure, or what methodology she utilized to differentiate normal from "excessive" use.

- Also regarding Vehicle 57, Ms. Nieto opines, "[i]t is uncommon to see a head gasket fail at such low mileage. I suspect the vehicle was overheated. That is a major engine mechanical repair needed at a very premature time in the vehicle's life." *Id.* at p.12. But she offers no explanation in support of her

10

> suspicion that the vehicle overheated, or a description of the methodology she employed to reach her conclusion that overheating was the probable cause for this failure.
>
> - Ms. Nieto opines that "[m]ost of the repairs detailed in this Report could have been prevented if the vehicles had been serviced pursuant to their factory maintenance schedule." *Id.* at p.9. Here she does identify the specific factory maintenance schedule for transmission service for three of the vehicles, and then opines, "[i]f the transmissions had been serviced with fresh fluid on their regular maintenance schedule (at 60,000 miles), there would not have been metal in the fluid and could have potentially prevented internal transmission failure." *Id.* But she doesn't explain her methodology supporting this opinion.

Examples like these pervade Ms. Nieto's opinion that the vehicles "were not in good operating condition and in need of substantial, material repair, well beyond that which could be considered ordinary or routine that should have been communicated." *Id.* at p.11. For these reasons, the Court finds Ms. Nieto has failed to demonstrate her opinion is based on any methodology that renders her opinions reliable under Rule 702. Federal courts routinely exclude as unreliable expert opinions that are based solely on the expert's experience and which lack any methodology. *See Korbe v. Doug Andrus Distrib., LLC*, No. 1:23-CV-01145-SKC-JPO, 2024 WL 2702149, at *4 (D. Colo. May 24, 2024) ("Dr. Leach's estimates of Plaintiff's future medical costs are

11

based solely on his experience without reference to data or any methodology used to arrive at those estimates."); *see also Dominguez v. Lubbock*, No. CIV-11-1347-R, 2012 WL 9431886, at *2 (W.D. Okla. Sept. 21, 2012) (expert did not explain the methodology or principles employed to reach the conclusions); *Miller v. Gorski Wladyslaw Est.*, No. 05-189, 2006 WL 3533113, at *4 (W.D. La. Dec. 6, 2006) ("[A]ll that has been offered to the court in support of the reliability of these estimates is Dr. Henderson's own assurance that based on his experience with other patients, the estimates made . . . are reliable.").

Plaintiffs have not met their burden to show that Ms. Nieto's first opinion satisfies the requirements of Fed. R. Evid. 702. And her other opinions invade the province of the Court. For these reasons, the Motion is GRANTED, and Plaintiffs are precluded from offering Ms. Nieto's expert opinions at trial.

DATED: August 22, 2024

BY THE COURT:

_____

S. Kato Crews
United States District Judge